**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**

Graham Construction Services, Inc.,                    Case No: 4:11-cv-01316-JCH

       Plaintiff,

vs.                                                    **SECOND AMENDED COMPLAINT**

Hammer & Steel, Inc.,                                  **(JURY TRIAL DEMANDED)**

       Defendant.

For its Second Amended Complaint, Plaintiff Graham Construction Services, Inc. ("Graham") states and alleges as follows:

**THE PARTIES**

1.     Graham is a Minnesota corporation, with its principal place of business located at 2995 Lone Oak Circle #5, Eagan, Minnesota.

2.     Defendant Hammer & Steel, Inc. ("H&S") is a Missouri corporation, with its principal place of business located at 11916 Missouri Bottom Road, Hazelwood, Missouri.

**JURISDICTION AND VENUE**

3.     Jurisdiction in this case is proper pursuant to 28 U.S.C. § 1332 in that there is complete diversity between Graham and H&S and the amount in controversy exceeds $75,000 in value, exclusive of interest and costs.

4.     Venue in this case is proper pursuant to 28 U.S.C. § 1391(a) and (c) in that H&S, as a Missouri corporation, is subject to personal jurisdiction in Missouri and is consequently deemed to reside in Missouri for the purposes of venue.

5.     The Northwestern Division of the District Court of North Dakota transferred this case to the District Court of the Eastern District of Missouri pursuant to 28 U.S.C. § 1404(a) by court

N:\PL\81259\81259-010\1448563.doc                    1

order dated July 27, 2011 [Docket 34].   Assignment of this case to the Eastern District of Missouri is in accordance with that Order.

## FACTS

6.      On or about October 1, 2009, Graham as subcontractor, and Industrial Contract Services, Inc., as general contractor, entered into a subcontractor agreement (the "Subcontract") to provide certain construction services for the Parshall Raw Water Intake Structure project located in Parshall, North Dakota (the "Project").

7.      Graham's work under the Subcontract included, among other things, the construction of a caisson, or a shaft for a foundation.   To construct the caisson, Graham required specialized drilling equipment.

8.      In the past, Graham had previously leased drilling equipment from H&S on other construction projects by relying on H&S's recommendations for appropriate drilling equipment.

9.      When Graham decided to submit bid for the work under the Subcontract, it consulted with H&S (in particular with Todd Maxa, an H&S employee), regarding H&S's ability to supply and lease appropriate drilling equipment to Graham for the construction of the caisson.   Graham provided H&S with, among other things, a geotechnical report and a full set of the geotechnical boring logs for the Project and the intended location of the caisson, which H&S reviewed.

10.      Before submitting its bid for the work under the Subcontract, H&S, through its agent, Maxa, assured and represented to Graham that it could supply the appropriate drilling equipment for the construction of the caisson.   Through Maxa and Joe Dittmeier, H&S knew, or reasonably should have known, that the requirements of the Project included a completion deadline for the construction of the caisson and the potential for the assessment of actual and/or liquidated damages against Graham if the construction of the caisson was not completed on time.

N:\PL\81259\81259-010\1448563.doc                    2

11.    H&S, through its corporate representations, documents, and its employees (in particular, Maxa), affirmatively represented and held itself out to Graham and to the world that H&S had the ability and expertise to lease appropriate drilling equipment for the construction of caissons at various depths.

12.    H&S, through its corporate representations, documents, and its employees (in particular, Maxa), affirmatively represented and warranted to Graham that it had the ability and expertise to recommend the appropriate drilling equipment for the construction of caissons at various depths.

13.    H&S, through its corporate representations, documents, and its employees (in particular, Maxa), affirmatively represented and warranted that it understood that Graham was seeking proposals for the appropriate drilling equipment for the construction of the caisson for the Project.

14.    H&S, through its corporate representations, documents, and its employees (in particular, Maxa),  affirmatively represented and warranted that it understood that Graham was reasonably relying on H&S's skill, capability, and judgment to recommend appropriate drilling equipment for the construction of caisson for the Project.

15.    Before the start of construction of the caisson for the Project, Maxa attended a meeting with Graham and Graham's consulting engineer for the caisson design, Engineering Partners International, LLC ("Engineering Partners").  At this meeting, Maxa advised Graham on the type and size of drilling equipment Graham would need to complete the construction of the caisson.  Maxa also assisted Engineering Partners in finalizing the design for the excavation pit for the caisson construction and the design of the drill platform required for H&S's drilling equipment, and provided recommendations so that the design of the sheetpile shoring system

would accommodate the size of the drill and drilling tools to be supplied by H&S for the construction of the caisson.

16.     On or about September 17, 2009, H&S provided Graham a proposal for the design, fabrication, and sale of a 168" Max Cut Over Reaming Tool ("Over Reaming Tool").  Based on Engineering Partners' caisson design, the geotechnical report, and the soil boring logs, H&S represented to Graham that the Over Reaming Tool would accomplish the required drilling for the caisson.  H&S also represented to Graham that Graham should lease a Sany Model SR 250 Hydraulic Drilling Rig (the "Sany Drill Rig") from H&S to drive the Over Reaming Tool for the construction of the caisson.  H&S further represented to Graham that the only drilling rig that could be used to reach the depths required for the Project was the Sany Drill Rig.

17.     H&S, through itself and Maxa, represented and warranted that the drilling equipment it proposed was based on the geotechnical information that Graham had provided and appropriate for use on the Project.

18.     H&S, through itself and Maxa, represented and affirmed that it understood that if its proposed drilling equipment could not accomplish the required drilling for the caisson for the Project, Graham Construction would be prevented from completing the Project on time.

19.     Based on these representations and assurances, Graham agreed to purchase the custom designed Over Reaming Tool from H&S, and on or about December 3, 2009, Graham also signed an equipment rental agreement for the lease of Sany Drill Rig from H&S (the "Rental Agreement").

20.     Pursuant to the Rental Agreement, Graham has paid H&S a portion of the agreed upon lease payments for the rental of the drilling equipment, including the Sany Drill Rig.

21.     On or about December 12, 2009, Graham began drilling the pilot shaft with a 60" auger head leased from Defendant.  Upon reaching a depth of approximately 115 feet, the Kelly bar (a component of the drill shaft) of the Sany Drill Rig snapped, leaving the 60" auger head approximately 115 feet below the surface of the caisson excavation pit.  Because the 60" auger head was located near the bottom of the shaft, it obstructed Graham's ability to continue the drilling to the required depth for the caisson.  Graham attempted to retrieve the 60" auger head using various methods, all without success.  Throughout this time, Graham requested H&S's assistance to retrieve the 60" auger head so that progress could continue on the Project.  When Graham attempted to use the 36" auger head to drill a secondary shaft beside the pilot shaft to retrieve the 60" auger head, the auger receiver box snapped.  Graham later made a second and third attempt to drill, and the Kelly bar snapped a second and third time.  In other words, Hammer & Steel's equipment repeatedly broke and Graham provided Hammer & Steel with multiple opportunities to cure, but Hammer & Steel failed to meet its obligations.

22.     After repeated attempts to retrieve the 60" auger head from the caisson shaft without success and in danger of missing the completion deadline for the construction of the caisson that would result in the assessment of liquidated damages, Graham was forced to relocate the caisson at the Project.  Relocation of the caisson forced Graham to incur, among other things, significant expenses and delays relocating the caisson excavation pit and the drilling platform.

23.     At this time, through Maxa and Dittmeier, H&S informed Graham that the Sany Drill Rig could not complete the required drilling for the construction of the caisson and informed Graham that it would be removing the Sany Drill Rig from the Project.

24.     H&S's admission that the Sany Drill Rig could not complete the caisson construction for the Project constituted a repudiation of the Rental Agreement.

25.    H&S's admission that the Sany Drill Rig could not complete the caisson construction for the Project constituted a material breach of the Rental Agreement.

26.    As a result of H&S's repudiation of contract and material breach of contract, Graham was forced to cover and immediately place an order for the leasing of new drilling equipment with another company so that: (1) Graham could attempt to timely complete the Project; and (2) Graham could avoid and/or minimize the assessment of liquidated damages.

27.    The drilling equipment Graham leased from H&S for the Project failed its essential purpose and was not fit for the intended purpose.

28.    As a result of the failures, misrepresentations, breaches of contract, and repudiations of contract of H&S, Graham has incurred, among other damages, relocation costs associated with the new caisson location on the Project, construction delay costs, costs in trying to retrieve and utilize damaged equipment,  the assessment of liquidated damages, and additional costs in securing replacement drilling equipment.

## COUNT I - BREACH OF CONTRACT

29.    The preceding paragraphs are incorporated as if stated fully herein.

30.    Graham and H&S entered into a contract for the lease of drilling equipment for the Project.

31.    H&S  breached the agreement by leasing faulty, inappropriate, or otherwise defective drilling equipment, including the Sany Drill Rig to Graham.

32.    As a direct and proximate result of H&S's above-referenced breaches, Graham has been damaged in an amount substantially in excess of $75,000.00, exclusive of interest, costs, disbursements, and attorney's fees.

## COUNT II – BREACH OF EXPRESS WARRANTIES

33.    All previous paragraphs are incorporated as if stated fully herein.

34.    The Rental Agreement contained express warranties for the drilling equipment, including the Sany Drill Rig, that provided that the equipment was appropriate for the Project.

35.    H&S also expressly warranted to Graham that the drilling equipment, including the Sany Drill Rig, would work for the purposes for which it was intended on the Project.

36.    Graham reasonably relied upon the express warranties provided by H&S.

37.    The express warranties were a material factor which induced Graham to lease the drilling equipment, including the Sany Drill Rig.

38.    H&S breached its express warranties by supplying drilling equipment, including the Sany Drill Rig, that was not in good working order and/or which could not complete the required work associated with the construction of the caisson for the Project.

39.    Any alleged waiver or disclaimer of H&S's express warranties is unenforceable and of no effect.

40.    As a direct result of the H&S's breaches of warranty, Graham has been damaged in an amount substantially in excess of $75,000, exclusive of interest, costs, disbursements, and attorney's fees.

### COUNT III - BREACH OF IMPLIED WARRANTIES

41.    The preceding paragraphs are incorporated as if stated fully herein.

42.    Pursuant to Mo. Rev. Stat. §§ 400.2A-212, 400.2A-213, and N.D.C.C. Chap. 41-02, the Rental Agreement included implied warranties of fitness for a particular purpose and merchantability.

43.    H&S, at the time the lease contract was made, had reason to know that the equipment was required for the particular task to which Graham later attempted to put the equipment.

N:\PL\81259\81259-010\1448563.doc                    7

Graham had provided H&S with, among other things, a geotechnical report and a full set of the geotechnical boring logs for the Project and the intended location of the caisson, which H&S reviewed.

44.   H&S also knew that Graham was relying on H&S's skill and judgment to select and furnish suitable equipment for the task.

45.   Consequently, there was in the lease contract an implied warranty that the equipment would be fit for Graham's purpose.

46.   Furthermore, H&S routinely rents the type of drilling equipment that it rented to Graham on the Project.  H&S is a merchant with respect to the equipment.

47.   Consequently, a warranty that the equipment would be merchantable was implied in the lease contract.

48.   Graham reasonably relied upon the implied warranties provided by H&S.

49.   H&S breached these warranties by providing drilling equipment, including the Sany Drill Rig, that was not fit for the purpose for which it was offered, and was otherwise defective.

50.   As a result of the nonconformities, the equipment failed to serve the essential purpose for which it was leased.

51.   Any alleged waiver or disclaimer of H&S's implied warranties is unenforceable and of no effect.

52.   As a direct result of the H&S's breaches of implied warranty, Graham has been damaged in an amount substantially in excess of $75,000.00, exclusive of interest, costs, disbursements, and attorney's fees.

## COUNT IV – FRAUDULENT INDUCEMENT: ACTUAL FRAUD

53.   The preceding paragraphs are incorporated as if stated fully herein.

54. Graham and H&S engaged in negotiations regarding the terms of the Rental Agreement during August and September 2009. These negotiations were already complete when Graham signed the document that has been submitted to this Court by H&S.

55. Quint McDermand was the primary person from Graham discussing the terms of the equipment leasing with H&S. Graham engaged in these discussions with Todd Maxa of H&S, who consulted with Russ Meyer and Joe Dittmeier of H&S regarding the recommended Project equipment.

56. Graham is not in the business of equipment rental and is not an expert on drilling equipment. Therefore, Graham sought and relied on their recommendations for appropriate drilling equipment for the Project. Graham had sought and relied on H&S's recommendations on previous occasions when Graham had leased drilling equipment from H&S on other construction projects. H&S and its representatives did not object to Graham's reliance.

57. During August and September 2009, both in e-mails and at a September 14, 2009, meeting that occurred in Bloomington, Minnesota (at Graham's consulting engineer's offices), Maxa represented to McDermand that Graham should lease a Sany Model SR 250 Hydraulic Drilling Rig (the "Sany Drill Rig") from H&S to drive the Over Reaming Tool for the construction of the caisson. Maxa assured and represented to Graham that this and the other drilling equipment Graham proceeded to purchase and lease from H&S was the appropriate drilling equipment that could timely complete the construction of the caisson for the Project work

58. Subsequent to the September 14th meeting, on or about September 17, 2009, Maxa provided McDermand a proposal for the design, fabrication, and sale of a 168" Max Cut Over Reaming Tool ("Over Reaming Tool"). Based on Engineering Partners' caisson design, the

geotechnical report, and the soil boring logs, Maxa represented to McDermand on behalf of H&S that the Over Reaming Tool would accomplish the required drilling for the caisson.

59.    Maxa's assertions were false; the drilling equipment recommended by H&S, including the Sany Drill Rig, was not appropriate equipment to perform the Project work, and indeed could not perform that work.

60.    Maxa, Meyer, and Dittmeier knew or reasonably should have known that these assertions and representations were incorrect, and/or made in a manner not warranted by the information possessed by H&S.   Maxa, Meyer, and Dittmeier also did not have reasonable grounds to believe that these assertions and representations were true.

61.    Graham did not know that Maxa's assertions were false.

62.    H&S intended that Graham would rely on Maxa's assurances and representations and lease the drilling equipment, including the Sany Drill Rig, from H&S.

63.    Graham reasonably relied upon Maxa's assurances and representations, and leased the drilling equipment, including the Sany Drill Rig, from H&S.

64.    Contrary to Maxa's representations, the drilling equipment, including the Sany Drill Rig could not properly or timely complete the construction of the caisson for the Project work.

65.    Maxa's assurances and representations were material and false.  H&S intended that Graham rely on those false assurances and representations.  Graham was justified in relying on those assurances and representations.   By assuring Graham that the drilling equipment, including the Sany Drill Rig was the appropriate equipment to use for the Project, Defendant fraudulently induced Graham to lease the drilling equipment, including the Sany Drill Rig.

66.    Due to H&S's fraud, Graham is entitled to rescission of its contract with H&S. Additionally or in the alternative, Graham is entitled to recover from H&S an amount far in excess of $75,000.00, exclusive of interest, costs, disbursements, and attorney's fees.

### COUNT V – CONSTRUCTIVE FRAUD

67.    The preceding paragraphs are incorporated as if stated fully herein.

68.    Under Missouri and North Dakota law, H&S committed constructive fraud/fraudulent inducement.

    a.  As described in more detail above, H&S examined the geotechnical information for the Project and assured and represented to Graham through Maxa that the drilling equipment, including the Sany Drill Rig, was the appropriate drilling equipment that could timely complete the construction of the caisson for the Project work.

    b.  As described in more detail above, H&S's assertions were false; the drilling equipment recommended by H&S, including the Sany Drill Rig, was not appropriate equipment to perform the Project work, and indeed could not perform that work.

    c.  Maxa and H&S were ignorant of the truth of these assertions and representations.

    d.  Graham did not know that H&S's assertions were false.

    e.  H&S intended that Graham would rely on its assurances and representations and lease the drilling equipment, including the Sany Drill Rig from H&S.

    f.  Graham reasonably relied upon Maxa's assurances and representations, and leased the drilling equipment, including the Sany Drill Rig, from H&S  Contrary to Maxa's representations, the drilling equipment, including the Sany Drill Rig could not properly or timely complete the construction of the caisson for the Project work.

11

g.  Maxa's assurances and representations were material and false.  H&S intended that Graham rely on those false assurances and representations.  Graham was justified in relying on those assurances and representations.  By assuring Graham that the drilling equipment, including the Sany Drill Rig was the appropriate equipment to use for the Project, H&S fraudulently induced Graham to lease the drilling equipment, including the Sany Drill Rig.

69.  Due to H&S's constructive fraud, Graham is entitled to rescission of its contract with H&S.  Additionally or in the alternative, Graham is entitled to recover from H&S damages in an amount far in excess of $75,000.00, exclusive of interest, costs, disbursements, and attorney's fees.

## COUNT VI – NEGLIGENT MISREPRESENTATION

70.  The preceding paragraphs are incorporated as if stated fully herein.

71.  Under Missouri and North Dakota law, H&S is liable for negligent misrepresentation.

72.  H&S assured and represented to Graham that the drilling equipment, including the Sany Drill Rig, was the appropriate drilling equipment that could timely complete the construction of the caisson for the Project work.

73.  H&S failed to exercise reasonable care when supplying this information.

74.  H&S's assertions were false; the drilling equipment recommended by H&S, including the Sany Drill Rig, was not appropriate equipment to perform the Project work, and indeed could not perform that work.

75.  H&S intentionally supplied this information for the guidance of Graham in the leasing and purchasing of the drilling equipment, including the Sany Drill Rig.

76. Graham reasonably relied upon H&S's assurances and representations, and leased the drilling equipment, including the Sany Drill Rig, from H&S.

77. As a direct and proximate cause of H&S's assurances and representations, Graham has been damaged in an amount substantially in excess of $75,000.00, exclusive of interest, costs, disbursements, and attorney's fees.

### COUNT VII – REFORMATION

78. The preceding paragraphs are incorporated as if stated fully herein.

79. As described above, Graham and H&S reached an agreement regarding the rental of the Sany Drill Rig and the purchase of the Over Reaming Tool based on H&S's assurances that the Sany Drill Rig and the Over Reaming Tool constituted the appropriate equipment for the Project.

80. Graham's intention in renting the Sany Drill Rig and purchasing the Over Reaming Tool was to obtain the appropriate drilling equipment for the construction of the caisson for the Project. H&S, through its agent, Todd Maxa, fraudulently assured Graham that the Sany Drill Rig and Over Reaming Tool were the appropriate equipment.

81. Due to H&S's fraud (discussed above), error or mistake, the Rental Agreement did not express or conform to Graham's real intention. H&S was aware of the fact that the Rental Agreement did not reflect Graham's intention or understanding.

82. Under the doctrine of reformation, to the extent that the Rental Agreement does not expressly guarantee that the Sany Drill Rig and Over Reaming Tool were the correct equipment for the Project and that H&S will compensate Graham for any damages relating to the failure of this equipment to perform the Project work, the Rental Agreement should be revised to include this express guarantee, as the expression of the parties' real intention.

## COUNT VIII - QUANTUM MERUIT/UNJUST ENRICHMENT

83.     The preceding paragraphs are incorporated as if stated fully herein.

84.     By engaging in the wrongful conduct set forth above, H&S unjustly enriched itself at Graham's expense.

85.     Graham is entitled to recover from H&S an amount far in excess of $75,000.00, exclusive of interest, costs, disbursements, and attorney's fees, under the doctrine of quantum meruit and/or unjust enrichment.

WHEREFORE, Graham requests the following relief:

1. On all Counts of the Second Amended Complaint, judgment in favor of Plaintiff Graham Construction Services, Inc. and against Defendant Hammer & Steel, Inc. in an amount in excess of $75,000.00, together with interest, costs, disbursements, and attorneys' fees;

2. On Counts IV and V of the Second Amended Complaint, rescission, and/or damages in an amount in excess of $75,000.00, together with interest, costs, disbursements, and attorneys' fees; and

3. On Count VII of the Second Amended Complaint, reformation of the parties' agreement(s), and damages in an amount in excess of $75,000.00, together with interest, costs, disbursements, and attorneys' fees; and

4.     An award to Plaintiff of such further relief as is just and equitable.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.


**Dated:** March 22, 2012

                    **FABYANSKE, WESTRA, HART& THOMSON, P.A.**

By:    /s/ Kristine Kroenke
       Dean B. Thomson (MN # 0141045), *pro hac vice*
       dthomson@fwhtlaw.com
       Kristine Kroenke (MN #0336294), *pro hac vice*
       kkroenke@fwhtlaw.com
       800 LaSalle Avenue, Suite 1900
       Minneapolis, MN 55402
       (612) 359-7600


**DOWD BENNETT LLP**

James F. Bennett #65673
John D. Comerford #1443742
7733 Forsyth Blvd., Suite 1410
St. Louis, Missouri 63105
Phone: (314) 889-7300
Fax: (314) 863-2111

*Attorneys for Plaintiff Graham Construction Services, Inc.*

N:\PL\81259\81259-010\1448563.doc       15

## CERTIFICATE OF SERVICE

I hereby certify that on March 22, 2012, the foregoing document was filed electronically with the Clerk of Court through ECF, and that ECF will send an e-notice of the electronic filing to all attorneys of record as follows:

Jane Laurel Volz
Volz Law Firm, Ltd.
9846 Towering Oaks Curve
Prior Lake, MN 55372
volzlawfirm@gmail.com

David M. Duree, MBE 21003
David M. Duree & Associates
P.O. Box 1416
O'Fallon, IL 62269
law@dmduree.net

**DATED:** March 22, 2012

**FABYANSKE, WESTRA, HART
& THOMSON, P.A.**

By:     /s/ Kristine Kroenke
Dean B. Thomson (MN #141045), *pro hac vice*
dthomson@fwhtlaw.com
Kristine Kroenke (MN #0336294), *pro hac vice*
kkroenke@fwhtlaw.com
800 LaSalle Avenue, Suite 1900
Minneapolis, MN 55402
(612) 359-7600

**DOWD BENNETT LLP**
James F. Bennett #65673
John D. Comerford #1443742
**DOWD BENNETT LLP**
7733 Forsyth Blvd., Suite 1410
St. Louis, Missouri  63105
Phone:  (314) 889-7300

**ATTORNEYS FOR PLAINTIFF**

N:\PL\81259\81259-010\1448563.doc                16