# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| GRAHAM CONSTRUCTION SERVICES, INC., | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| HAMMER & STEEL, INC., | ) ) |
| Defendant. | ) ) ) |

Case No. 4:11-cv-01316-JCH

## DEFENDANT HAMMER & STEEL, INC.'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

## INTRODUCTION

This case arises from a dispute between Hammer & Steel, Inc. ("Hammer & Steel"), an equipment and material supply company, and Graham Construction Services, Inc. ("Graham"), a highly sophisticated construction contractor, over the rental of a Sany SR250 hydraulic drilling rig ("Sany drill rig") leased by Graham for a public construction project for the City of Parshall, North Dakota, pursuant to an unambiguous written agreement ("the Rental Agreement"). The Parshall project ("the Project") included the construction of a caisson shaft. Graham claims Hammer & Steel verbally assured Graham the drilling equipment it leased to Graham, and an over-reaming tool sold to Graham, would timely complete the caisson shaft.[1] Graham seeks payment for delay and other costs for the actual construction of the caisson. Hammer & Steel

---

[1] Graham does not seek to return the over-reaming tool.

1

seeks payment for past due rent, the value of augers Graham rented and has failed to return, and damages for repair of the Kelly bars that Graham broke.

During Graham's drilling operations on the Project, Graham broke the Kelly bar, a drilling component of the Sany drill rig, three times while attempting to drill and excavate the caisson shaft. Graham also broke another Kelly bar twice on a different drill rig Graham leased from another vendor after Hammer & Steel removed the Sany drill rig from the Project.

After significant discovery in this case, the crux of this dispute has boiled down to primarily one central fact issue: whether the Kelly bar breaks on the Sany drill rig were caused by Graham's misuse and abuse of the Sany drill rig, or a defect in the Kelly bar(s).[2] Graham claims there is a defect in the Kelly bar which caused the first Kelly bar break[3] and all of Graham's purported damages arise from that single break. Hammer & Steel contends Graham's misuse and abuse of the drill rig, and/or Graham's welding on the Sany drill rig when the rig was being used by Graham on a project in South Dakota, caused the first Kelly bar break.[4]

Now that discovery in this case is coming to a close, most of Graham's claims can be easily disposed of by summary judgment. There are no genuine issues of material fact regarding Counts II, III, IV, V, and VII of Graham's Second Amended Complaint (Doc. # 72) and these

---

[2] The Sany drill rig was new when Graham initially leased it for a project in South Dakota and was the only contractor to use the rig before the Kelly bar breaks. Discovery is still ongoing as to whether Graham itself may have performed a defective weld on the Kelly bar.

[3] Graham has not provided any opinion or evidence as to the cause of the second and third Kelly bar breaks on the Sany drill rig. (See Expert Report of Hamilton, Ex. 19, attached to Volz Aff., ¶ 20).

[4] Hammer & Steel's rebuttal expert determined the failure of the Kelly Bar was due to a combination of torsional and axial forces during the drilling operations due to Graham's failure to maintain the integrity of the hole through the cofferdam construction and dewatering efforts which caused undue fatigue and the ultimate failure on the Kelly bar because as it was repeatedly torqued in a forward and reverse direction due to the mud, silt, and water causing suction and high forces in the hole and the jog in the hole which hampered both entry and egress to and from the bottom of the hole during drilling operations. (See Expert Rebuttal Reports of Hainline & Associates (Rick MacKinnon) and Michael O'Neil, Exs. 13 and 20, attached to Volz Aff., ¶¶ 14 and 21).

claims can be dismissed as a matter of law.  Therefore, Hammer & Steel brings this motion for

partial summary judgment and respectfully requests the following relief:

(a)     a declaration that the December 3, 2009, Rental Agreement for the Sany drill rig and the Hartfuss 60-inch auger is valid and enforceable;

(b)     a declaration that Graham's damages (if any) are limited to the rent paid for the Sany drill rig under as provided in the Rental Agreement;

(c)     Dismissal of Counts II, III, IV, V, and VII, contained in Graham's Second Amended Complaint (Doc. #72) which includes claims for breach of express warranties, breach of implied warranties, fraudulent inducement/actual fraud, constructive fraud, and reformation; and

(d)     Judgment against Graham and in favor of Hammer & Steel for the value of the Hartfuss 60-inch auger as provided in the Rental Agreement.  The value of the auger is $52,387.00.

## STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1.     Graham Construction Services, Inc., ("Graham"), is a Minnesota corporation with its registered office located at 2995 Lone Oak Circle, Eagan, Minnesota 55121.  (Second Amended Complaint, hereinafter "Complaint" or "Compl.", (Doc. #72), ¶ 1).

2.     Graham is a wholly owned subsidiary of the Graham Group which has been in business since 1924.  Graham Group is a highly sophisticated construction contractor and was the fifth largest construction company in Canada with revenue of $1.8 billion in 2010 with U.S. offices in the states of Minnesota, Nebraska and Washington.  (Exhibit 1, attached to affidavit of Jane L. Volz, ¶ 2, hereinafter "Volz Aff., ¶ 2, Ex. 1").

3.     Defendant Hammer & Steel is a Missouri corporation with its principal office located at 11916 Missouri Bottom Road, Hazelwood, Missouri, 63042.  (Second Amended Answer and Amended Counterclaim (Doc. #73, ¶ 2)).

4.      Robert Todd Maxa is Hammer & Steel's Upper Midwest Territory Manager and has held that position for over 18 years.  (Affidavit of Robert Todd Maxa, ¶ 1, hereinafter "Maxa Aff., ¶ 1").

5.      Joseph Dittmeier is the President of Hammer & Steel and has been in the business of leasing and selling sheet piling and pile driving equipment since 1974.  Hammer & Steel, Inc. has been in business since 1989.  (Affidavit of Joe Dittmeier, ¶ 1, hereinafter "Dittmeier Aff., ¶ 1").

6.      Quint McDermand ("McDermand") was Graham's Senior Project Manager for the Project with over 23 years of experience in the construction industry.  McDermand has taken courses in cost awareness and production control and construction law.  (Volz Aff., ¶ 3, Ex. 2 (McDermand's resume)).

7.      Thomas Baldwin ("Baldwin") was one of Graham's many superintendents for the Project (Volz Aff., ¶ 4, Ex. 3 (Baldwin's resume)).

8.      Todd Jones ("Jones") was another one of Graham's superintendents on the Project. (Volz Aff., ¶ 5, Ex. 4 (Jones' resume)).

9.      Chad Underwood ("Underwood") was one of the engineers from Engineering Partners Internationals ("Engineering Partners") that designed the earth retention system (sheet pile cofferdam) and drilling platform for the caisson construction. (Affidavit of Chad Underwood, ¶2, hereinafter "Underwood Aff., ¶ 2" attached to Volz Aff., ¶6, Ex. 5).

10.      Hammer & Steel and Graham have entered into numerous written rental agreements and sales agreements for equipment and material over the past several years. Hammer & Steel has never guaranteed or assured Graham that a particular piece of equipment would successfully and timely complete a construction project.  (Maxa Aff., ¶ 2).

4

11.     On October 15, 2008, Hammer & Steel provided Graham with a quote for the Sany drill rig for a project in Mobridge, South Dakota. (Maxa Aff., ¶ 5, Ex. E).

12.     On December 1, 2008, Graham executed an equipment rental agreement for the Sany drill rig. (Maxa Aff., ¶ 6, Ex. F).

13.     On August 25, 2009, Hammer & Steel provided Graham with a quote for the identical Sany drill rig and other equipment including a Delmag drill rig, a 60-inch auger and an over-reaming tool. (Maxa Aff., ¶ 7, Ex. G).

14.     On September 14, 2009, a meeting was held at Engineering Partners' office to discuss the design of the drill platform.  (Underwood Aff., ¶ 2).  Underwood made it clear to Graham that Hammer & Steel did not design the excavation pit for the caisson construction. (Volz Aff., ¶ 26, Ex. 25 (Underwood's revised affidavit to Graham's attorney, ¶9)).

15.     On November 2, 2009, the City of Parshall approved Engineering Partners' design for Graham's "Complete Caisson Installation Procedure."   (Volz Aff., ¶ 7, Ex. 6).

16.     On or December 3, 2009, Hammer & Steel, as lessor, and Graham, as lessee, entered into an equipment rental agreement for the lease of certain equipment including a Sany Model SR 250 hydraulic drilling rig and a 60 inch Hartfuss heavy duty rock auger (hereinafter the "Rental Agreement").  (Maxa Aff., ¶ 8, Ex. H).

17.     Graham chose the Sany drill rig for the Parshall project because its operator was familiar with that drilling rig from a previous project (Mobridge, South Dakota) and because it was cheaper than the Delmag rig (a larger drill rig).  (McDermand Depo., p. 227, attached to Volz Aff., ¶ 8, Ex. 7).

18.     On December 3, 2009, Graham issued Purchase Order #9228 for the Sany drill rig and the drill tooling (the 60-inch auger). (Volz Aff., ¶ 9, Ex. 8).

5

19.     Engineering Partners' design required welded corners for the cofferdam and required that the sheeting for the cofferdam be driven to the shale layer in accordance with shop drawing and design approved by the City of Parshall.  (Volz Aff., ¶ 7, Ex. 6, plan sheet 2).

20.     The Sany drill rig was delivered to Parshall, North Dakota on December 7, 2009. (Volz Aff., ¶ 10, Ex. 9).   At that time, Graham was already having problems controlling the silt and sand leaking through the sheet pile wall in the cofferdam.  (Id.)

21.     Graham made the first month's rent for the rental agreement on January 28, 2010, for $34,125.00.  (Volz Aff., ¶ 11, Ex. 10).

22.     Graham broke Hammer & Steel's Kelly bars on January 15, 2010, May 18, 2010, and July 10, 2010.  Hammer & Steel immediately repaired and replaced the first Kelly bar break on January 18, 2010.  Hammer & Steel replaced the second Kelly bar on May 29, 2010.  (Volz Aff., ¶ 14, Ex. 13 (Expert Rebuttal Report of Hainline & Associates (Rick MacKinnon))).

23.     Graham failed to install the cofferdam to protect the caisson shaft as designed by Engineering Partners causing sink holes, cave ins, and uncontrollable water in the caisson shaft. (Volz Aff., ¶¶ 12, 13, and 14; see Ex. 11 (as built diagram of the cofferdam); Ex. 12 (photograph of caisson excavation showing Sany drill rig and backhoe in water); and Ex. 13 (expert rebuttal report of Hainline & Associates, Rick MacKinnon)).

24.     Graham ultimately abandoned the caisson shaft for safety reasons (cave-ins) and filled in the shaft thereby burying Hammer & Steel's 60-inch auger and its 36-inch auger leased to Graham.  (Volz Aff., ¶ 15, Ex. 14).

25.     Pursuant to the Rental Agreement, Graham paid Hammer & Steel a portion of the agreed upon lease payments.  (Compl., ¶ 20).  Graham made principal payments totaling

6

$75,000.00, plus tax of $3,750.00, totaling $78,750.00 for the Sany drill rig for the Parshall project.  (Dittmeier Aff., ¶ 3, Exs. A, B, and C).

26.    Graham issued Hammer & Steel a Certificate of Liability Insurance naming Hammer & Steel, Inc. as an additional insured that Graham provided to Hammer & Steel for the equipment leased to Graham for the Parshall project as required by the terms of the December 3, 2009, rental agreement.  (Dittmeier Aff., ¶ 5, Ex. D).

27.    Graham 's Policy includes Additional Insured Endorsements.  (Volz Aff., ¶ 16, Ex. 15).

28.    Hammer & Steel demanded that Graham tender a claim to its insurer for the 60-inch auger and the 36-inch auger that Graham buried in the caisson shaft. (Volz Aff., ¶ 17, Ex. 16).

29.    Graham indicated it "did tender the claim to its insurers."  (Volz Aff., ¶ 18, Ex. 17 (email from Hannah Stein to Jane Volz)).

30.    On July 16, 2010, Hammer & Steel removed the Sany drill rig from the Project.  (Volz Aff., ¶ 19, Ex. 18).  Graham broke the Kelly bar on the second drill rig (from a different vendor) twice.  (See generally Volz Aff., ¶ 14, Ex. 13 (Expert Rebuttal Report of Hainline & Associates (Rick MacKinnon) pp. 12, 17-18)).

## ARGUMENT

### I.    SUMMARY JUDGMENT STANDARD

Hammer & Steel is entitled to summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 4.01(E), because there are no genuine issues of material fact regarding Graham's claims for breach of express and implied warranties, fraud, constructive fraud, and reformation (Counts II, III, IV, V, and VII).  Graham's allegations are insufficient as a

7

matter of law to establish a *prima facie* case for any of these counts.  Furthermore, the Rental Agreement is a valid, enforceable agreement and Graham cannot avoid the terms of this agreement by claiming it did not read the agreement.  Finally, the Rental Agreement expressly provides that Graham is responsible for the risk of loss of the equipment and therefore Hammer & Steel is entitled to a judgment in its favor for the value of the 60-inch auger Graham lost in the caisson shaft.

Summary judgment is appropriate if Hammer & Steel demonstrates there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  The facts and inferences are viewed in the light most favorable to, Graham, the nonmoving party.  Fed.R.Civ.P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Hammer & Steel carries the burden of establishing both the absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. Matsushita, 475 U.S. at 586-90, 106 S.Ct. 1348.

Once Hammer & Steel has met this burden, Graham may not rest on the allegations in the pleadings, but by affidavit or other evidence, must set forth facts showing that a genuine issue of material fact exists.  Fed.R.Civ.P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir.1997).  To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved.  Lower Brule, 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment.  Id.  Rather, "the disputes must be outcome determinative under prevailing law."  Id. (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts." Matsushita, 475 U.S. at 586, 106 S.Ct. 1348.  Demanding more than a metaphysical doubt respects the appropriate role of the summary judgment procedure:  "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."  Celotex, 477 U.S. at 327, 106 S.Ct. 2548.

## II.    MISSOURI LAW, NOT NORTH DAKOTA LAW, APPLIES HERE.

As a threshold matter, Graham alleges both North Dakota and Missouri law applies to its breach of implied warranties, constructive fraud, and negligent misrepresentation claims. (Compl., ¶¶  42, 68, 71).  Because the parties agreed that the Rental Agreement is governed by Missouri law, North Dakota law is not applicable.[5]

In a diversity action, the court must apply the choice of law rules that would be applied by the state courts of Missouri, the forum state.  28 U.S.C. § 1652; see, e.g., John T. Jones Const. Co. v. Hoot Gen. Const. Co., Inc., 613 F.3d 778, 782 (8th Cir. 2010).  Generally, parties may choose the state whose law will govern the interpretation of their contractual rights and duties. Sturgeon v. Allied Professionals Ins. Co., 344 S.W.3d 205, 210 (Mo. App. E.D. 2011).  A valid choice of law provision in a contract binds the parties.  Citibank (South Dakota, N.A. v. Wilson), 160 S.W.3d 810, 812 (Mo. App. W.D. 2005); see also State ex rel. McKeage v. Cordonnier, 357

---

[5] North Dakota, like Missouri, has adopted the UCC with regard to leases.  Consequently, the outcome of Graham's claim for breach of warranties (Counts II and III), would likely be the same, dismissal, whether applying North Dakota or Missouri law.   However, the North Dakota law for constructive fraud and negligent misrepresentation is not identical to Missouri law.  See N.D.C.C. §§ 9-03-08 and 9-03-09 (constructive fraud).  Further, North Dakota derives the doctrine of negligent misrepresentation from the same fraud statutes, N.D.C.C. § 9-03-08.  See Bourgois v. Montana-Dakota Utilities Co., 466 N.W.2d 813, 817 (N.D.1991).

S.W.3d 597, 600 (Mo. banc 2012) (contracting parties are bound by their selection of the applicable substantive law for resolving a future dispute).  The Rental Agreement expressly provides "[t]his agreement will be governed by the laws of the State of Missouri."  (Rental Agreement, ¶ 19, Maxa Aff., ¶ 8, Ex. H).  Therefore Missouri law governs the disputes in this case by virtue of this valid choice of law provision in the Rental Agreement.

**III.   GRAHAM CANNOT AVOID THE TERMS OF THE RENTAL AGREEMENT.**

It is undisputed that Graham issued a purchase order to Hammer & Steel for the Sany drill rig and auger, executed the Rental Agreement for this equipment, and obtained possession of the equipment.  Further, as required by the Rental Agreement, Graham provided an additional insured certificate naming Hammer & Steel as an additional insured.  Graham also made lease payments, albeit late, to Hammer & Steel for two and one-half months' rent for the equipment.  By its own conduct, most importantly by signing and executing the Rental Agreement, Graham agreed to and is bound by its terms.

Under Missouri law, a person who has an opportunity to read a document but signs it without so doing is held to have knowledge of the documents contents, absent a showing of fraud.  U.S. for Use of Bussen Quarries, Inc. v. Thomas, 938 F.2d. 831, 833 (8th Cir.1991).  Moreover, "a person cannot avoid a written contract on the ground that he did not attend its terms, or that he supposed it was different in its terms, or that it was a mere form."  Haines v. St. Charles Speedway, Inc., 689 F.Supp. 964, 968 (E.D. Mo. 1988), aff'd 874 F.2d 572 (8th Cir.1989) (quoting Ragan v. Schreffler, 306 S.W.2d. 494, 499 (Mo. 1957)).  A contracting party, who is competent to contract, is presumed to know the contents of the papers he or she is signing and the fact that the contracting party fails to read the papers or does not have someone else read them to her/him does not rebut this presumption.  Haines, at 968.

Here, McDermand, a competent construction professional with over 23 years of experience and training in construction law, had an opportunity to read the additional terms and conditions of the Rental Agreement (the same type of agreement he had signed on numerous occasions) but apparently voluntarily chose not to read them.  Graham cannot avoid the terms of the Rental Agreement by claiming McDermand did not read the agreement.  Furthermore, Graham issued a purchase order number (#9228) for the equipment thereby affirming the agreement and paid the first month's two weeks *after* the first Kelly bar break.  The first page of the Rental Agreement clearly states there are two pages and that the lessee (Graham) "agrees to the terms and conditions set for in this agreement."  The first page of the Rental Agreement also provides (in italics) "[p]lease read all pages of this document carefully."

When questioned about the Rental Agreement, McDermand testified:

> Q. I've put in front of you what's been marked as Exhibit No. 35 (the Rental Agreement).  Do you recognize this document?
> **A. Yes.**
> Q. Is this the agreement that you reached with Hammer & Steel with regard to the rental of the Sany drill rig and the 60-inch heavy-duty auger?
> **A. The signature page is.**
> Q. In your mind, what are the terms and conditions of this rental agreement?
> **A. I rented this rig for 30,000 a month, with a $2,500 60-inch auger, that – with a rig that's supposed to perform.**
> Q. Perform what?
> **A. The task.**
> Q. What's the task?
> **A. The drilling of the – of the shaft.**
> Q. And so you are saying that Hammer & Steel guaranteed that this particular drill rig would perform the task on the job?
>
> MR. COLLINS:  OBJECTION, CALLS FOR A LEGAL CONCLUSION.  YOU CAN ANSWER.
>
> **THE WITNESS:  Hammer & Steel provided – gave me a rig and a system and provided the – the idea or the tool information and system to do that job.**

11

(McDermand Depo., pp. 179-183).

McDermand also testified that Maxa "guaranteed me this rig would do that job." (Id., p. 181).  When asked "what exactly did [Maxa] say to make you believe that [Maxa] was saying that this job would work", McDermand testified Maxa said: "This rig with the over-reaming tool and the reach would do that job." (Id., p. 182).  All of these alleged conversations occurred months before McDermand signed the Rental Agreement and contradict the express terms of the signed agreement.

Graham also affirms the terms of the Rental Agreement in its answer to Hammer & Steel's counterclaim (Doc. #50).[6]  Graham admits that it entered into an equipment rental agreement with Hammer & Steel for the Sany drill rig and a 60-inch auger but "denies all allegations . . . that are inconsistent with its rental agreement." (Graham's Answer to Counterclaim (Doc. #50), ¶ 5).  Graham's argument that Hammer & Steel guaranteed the Sany drill rig would timely and effectively perform the caisson excavation contradicts the unambiguous terms of the Rental Agreement and Missouri law.  The Rental Agreement is a valid, unambiguous agreement that binds both Graham and Hammer & Steel to its express terms.  Hammer & Steel therefore requests the Court grant it partial summary judgment declaring that the Rental Agreement is valid and enforceable.

## IV.   THE PAROLE EVIDENCE RULE EXCLUDES ANY STATEMENT OR EVIDENCE THAT GRAHAM SEEKS TO OFFER WHICH WOULD ALTER OR CHANGE THE TERMS OF THE RENTAL AGREEMENT.

Graham does not contend Hammer & Steel made any false representations regarding the terms and conditions, or any other provision of the two-page Rental Agreement.  Moreover, Graham does not contend the Rental Agreement is ambiguous.  Rather, Graham insists that on

---

[6] Graham has not answered Hammer & Steel's Amended Counterclaim (Doc. # 60) or its Second Amended Answer and Amended Counterclaim (Doc. # 73).

September 14, 2009, nearly three months before signing the Rental Agreement, Maxa made an oral assurance to McDermand that the drilling equipment Graham purchased and leased from Hammer & Steel "was the appropriate drilling equipment that could timely complete the construction of the caisson for the Project work[.]"  (Compl., ¶ 57).  This purported vague oral assurance contradicts the written terms of the Rental Agreement and therefore must be excluded under the parol evidence rule.

"Missouri contract law strictly prohibits the use of extrinsic evidence to interpret or cast doubt on a contract that is clear and unambiguous."  Union Electric Co. v. Consolidated Coal Co., 188 F.3d 998, 1002 (8th Cir. 1999) (citing Royal Banks v. Fridkin, 819 S.W.2d 359, 361 (Mo. 1991) ("The parol evidence rule bars extrinsic evidence, unless an integrated contract is ambiguous.")).  Accordingly, the parol evidence rule excludes any statement or evidence that Graham seeks to offer which would alter or change the terms of the Rental Agreement.

Section 2A of the Uniform Commercial Code, codified under Missouri law as Section 400.2A-101 *et. seq.* of the Missouri Uniform Commercial Code ("MUCC"), also governs the Rental Agreement.  Section 400.2A-202 provides:

**Final written expression--parol or extrinsic evidence.**

Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented:

(a) by course of dealing or usage of trade or by course of performance; and

(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

Paragraph 19 of the Rental Agreement fully integrates the agreement by providing "[t]his is the entire agreement between the parties . . . . and [t]here are no other oral or written promises, terms conditions, representations of quality of fitness for any purpose, or warranties express or implied, concerning the equipment, other than those contained herein in writing, if any." Paragraph 19 of the Rental Agreement fully supports application of the parol evidence rule, as well as Section 400.2A-202 of the MUCC.  Graham is prohibited from introducing any evidence that contradicts the terms of a final agreement. Since Graham signed and executed the clear and unambiguous Rental Agreement, and Paragraph 19 clearly articulates the Rental Agreement as a final expression of the agreement between Lessor (Hammer & Steel) and Lessee (Graham), as a matter of law the parol evidence rule prohibits the introduction of evidence of any prior agreement (*i.e.* the purported assurances) that contradicts the written agreement.

Moreover, even assuming (without conceding) that the parol evidence rule does not apply (which it does), there is no reliable evidence to support the alleged assurances made by Hammer & Steel that the Sany drill rig and the over-reaming tool would complete the caisson construction.  McDermand, Baldwin, and Underwood attended the September 14, 2009, meeting where these alleged assurances were supposedly made by Maxa.  When asked about these purported representations, the meeting attendees testified to the following:

**Testimony of McDermand:**

> Q.    What were the words you believe Mr. Maxa told you at that meeting at Engineering Partners?
> **A.    I don't know the exact words.**
> Q.    Did he use the word guarantee?
> **A.    I don't know.  I don't think so.**
> Q.    Did you consider Hammer & Steel a subcontractor on the Parshall project?
> **A.    No.**

14

Q. They were just an equipment rental company, at least with respect to this agreement that's been marked as Exhibit 35 (the Rental Agreement); is that correct?

A. **Yeah.  They are a company that provided a piece of equipment.**

(McDermand Depo., pp. 181-182).[7]

**Testimony of Underwood:**

Q. Okay.  And at that meeting do you recall Mr. Maxa saying anything to the effect that he would guarantee that the Sany drill rig would complete the construction of the caisson for the Parshall project?

A. **I don't recall any comments like that.**

(Underwood Depo., p. 29).[8]

**Testimony of Baldwin:**

Q. Okay.  Going back to that meeting you had at Engineering Partners where Todd Maxa was there, do you recall Todd Maxa ever saying at that meeting that he guaranteed that this drill rig and reaming tool would complete the caisson construction?

A. **I don't recall.**

Q. Do you ever recall him saying that he promised that this would system would complete Graham's project with regard to the caisson construction?

A. **I don't recall.**

(Baldwin Depo., p. 105).

Graham simply does not have any reliable evidence that these purported assurances ever occurred – because they did not.  The Rental Agreement is the final written instrument between the parties and Graham is bound by its terms.

In addition, there is no evidence to support Graham's claim the over-reaming tool it purchased from Hammer & Steel  did not "accomplish the required drilling for the caisson." (Compl., ¶¶ 58, 59).  The over-reaming tool completed the caisson construction and Graham has

---

[7] See Volz Aff., ¶ 7, Ex. 7.
[8] See Volz Aff., ¶ 22, Ex. 21.

not requested to return this tool or for damages related to this tool.  With regard to the over-reaming tool, McDermand testified:

> Q.      So was there anything wrong with the design that you claim Hammer & Steel did with regard to the over-reaming tool?
>
> MR. COLLINS:  OBJECT TO THE FOUNDATION.  YOU CAN ANSWER IF YOU UNDERSTAND.
>
> **THE WITNESS:  Nothing that I am aware of.**

(McDermand Depo., pp. 160-161).

Jones similarly testified:

> Q.      Okay.  And were you happy with the way the 14-foot reaming tool worked on the Parshall project?
> A.      **The reaming tool itself worked all right.**
> Q.      Okay.
> A.      **We had to modify it.**
> Q.      Okay.
> A.      **But it did work all right.**
> Q.      It ultimately finished the caisson for the project?
> A.      **The – the 14-foot tool itself actually did, yes.**

(Jones Depo., p. 200).[9]

Missouri common law as well as the MUCC does not allow Graham to avoid the express terms it agreed to with regard to the Sany drill rig by introducing contradictory self-serving terms into the Rental Agreement.  As a result, the Rental Agreement is the final expression of the parties and all of the alleged assurances and/or guarantees Graham claims were made by Maxa are irrelevant and inadmissible.

## V.      DAMAGES ARE LIMITED TO PAYMENTS MADE UNDER THE RENTAL AGREEMENT.

Graham seeks damages totaling $1,400,881.54, which includes $1,334,117.54 in purported "direct costs" and $66,764.00 for alleged labor inefficiencies.  (See Joseph E. Manzi's

---

[9] See Volz Aff., ¶ 24, Ex. 23.

Expert Report, Ex. 24, attached to Volz Aff.).  Graham disregards the express language of the

Rental Agreement which limits damages and provides an exclusive remedy if the equipment fails

to perform.  Missouri law, including the MUCC, readily permits contracting parties to provide

exclusive remedies and to limit their liability.  Section 400.2A-503 of the MUCC (emphasis

added) provides:

> **Modification or impairment of rights and remedies.**
>
> (1) Except as otherwise provided in this Article, the lease agreement may include rights and remedies for default in addition to or in substitution for those provided in this Article and may limit or alter the measure of damages recoverable under this Article.
>
> (2) Resort to a remedy provided under this Article or in the lease agreement is optional <u>unless the remedy is expressly agreed to be exclusive</u>.  If circumstances cause an exclusive or limited remedy to fail of its essential purpose, or provision for an exclusive remedy is unconscionable, remedy may be had as provided in this Article.
>
> (3) Consequential damages may be liquidated under section 400.2A-504, or may otherwise be limited, altered, or excluded unless the limitation, alteration, or exclusion is unconscionable. Limitation, alteration, or exclusion of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation, alteration, or exclusion of damages where the loss is commercial is not prima facie unconscionable.
>
> (4) Rights and remedies on default by the lessor or the lessee with respect to any obligation or promise collateral or ancillary to the lease contract are not impaired by this Article.

Like in the MUCC, disclaimers of consequential and incidental damages in commercial

contracts are generally enforceable under Missouri law.  <u>Trinity Products, Inc. v. Burgess Steel,</u>

<u>L.L.C.</u>, 486 F.3d 325, 332 (8th Cir. 2007) (citing <u>General Elec. Capital Corp. v. Rauch</u>, 970

S.W.2d 348, 358 (Mo. App. 1998)).  Hammer & Steel effectively and properly provided an

express *exclusive remedy* limiting Graham's remedies in the Rental Agreement to repair of the

equipment.

17

Paragraph 16, entitled "**LIMITATION OF REMEDIES"** of the Rental Agreement provides the "Lessor's entire liability and Lessee's *exclusive remedy* is set forth in this Section." (emphasis added).  Paragraph 16 goes on to provide:

> In all situations involving performance or nonperformance of the equipment leased hereunder, the Lessee's remedy is
>
> (1)     The adjustment of or repair of the equipment or replacement of it by Lessor, at Lessor's option, or
>
> (2)     If Lessor, after repeated efforts, is unable to restore the equipment to good working order or to replace it, all as warranted, the Lessee shall be entitled to recover actual damages to the limits set forth in this section.

Paragraph 16 further provides:

> Lessor's liability for damages to the Lessee for any cause whatsoever, except as otherwise stated in this section, and regardless of the form of action, whether in contract or tort including negligence shall be the total lease or rental charges for the specific piece of equipment that caused the damages or that are the subject matter of, or are directly related to, the cause of the action.  Such charges shall be those in effect for the specific piece of equipment when the cause of action arose.

Paragraph 6, entitled "**NON-WORKING TIME"** of the Rental Agreement also provides in relevant part that "No 'back charges' for job delay or other damages shall apply against Lessor."

This clear and unambiguous language provides that Graham's exclusive remedy for any performance issues with regard to the Sany drill rig is limited to repair of the Sany drill rig at Hammer & Steel's option.  Further, the  only equipment that Graham claims was inappropriate and/or faulty is the Kelly bar.  McDermand testified as follows:

> Q.     Then you state, "In fact, the equipment was inappropriate and/or faulty, and incapable of performing the intended . . . work."  So let's talk about that.  What was inappropriate about the equipment?
> **A.     The Kelly bar.**
> Q.     And what was wrong with the Kelly bar?
> **A.     It kept breaking.**
> Q.     And what was faulty about the equipment?

> **A.**    **I don't know what the faulty part was, but the Kelly bar kept breaking.**
>
> Q.    Is there anything else that was inappropriate with regard to the equipment besides the Kelly bar?
>
> **A.**    **I don't know.**
>
> Q.    You don't know of anything?
>
> **A.**    **I don't know.**
>
> Q.    Who would know?
>
> **A.**    **Todd Jones, our superintendent.**

(McDermand Depo., p. 212).[10]

Todd Jones testified:

> Q.    Okay.  As you sit here today did you have any problems with Hammer & Steel on the Parshall project other than the Kelly bar breaking on the Sany SR250 drill rig?
>
> **A.**    **Not that I can recall.**

(Jones Depo., p. 263).[11]

Therefore, when the Kelly bar failed on January 15, 2010, Graham's sole and exclusive remedy (at Hammer & Steel's option) was to have Hammer & Steel repair the Sany drill rig (assuming the broken Kelly bar was Hammer & Steel's fault, which it was not according to O'Neil's expert rebuttal report).  Hammer & Steel repaired the drill rig (within three days) by sacrificing another valuable Sany drill rig by taking its Kelly bar off and immediately shipping it to Graham.  Graham, therefore, has no damages even assuming the first Kelly bar break was due to Hammer & Steel because Hammer & Steel provided the agreed upon remedy and timely repaired and replaced the Kelly bar.

The maximum damages that Graham can claim is "the total lease or rental charges for the specific piece of equipment that caused the damages." (Rental Agreement, ¶ 16).  Accordingly, the Rental Agreement limits Graham's damages to $78,750.00 ($75,000.00 plus tax) which is the amount of rent Graham paid for the Sany drill rig.  Thus, even assuming (without conceding) the

---

[10] See Volz Aff., ¶ 8, Ex. 7.
[11] See Volz Aff., ¶ 24, Ex. 23.

Kelly bar break was due to the fault of Hammer & Steel, Graham's damages are limited to $78,750.00.

Furthermore, the exclusive remedy to repair the equipment does not fail of its essential purpose.[12] Graham contends the "equipment failed to serve the essential purpose for which it was leased." (Compl., ¶ 50). The exclusive and limited remedy of repair is valid and enforceable because under Missouri law, the remedy of repair, if timely accomplished, does not fail of its essential purpose. See, e.g., Midwest Printing, Inc. v. AM Intern., Inc., 108 F.3d 168, 172 (8th  Cir. 1997) (applying Missouri law and citing Transport Corp. of America, Inc. v. International Bus. Machs., Inc., 30 F.3d 953, 959 (8th Cir.1994) (holding that the remedy of repair and service did not fail of its essential purpose when seller provided warranty service on the product and accomplished repair)). The only time an exclusive warranty to repair or replace fails of its essential purpose is when the "warrantor fails to correct the defect within a reasonable period . . . ." R.W. Murray Co. v. Shatterproof Glass Corp., 758 F.2d 266, 272 (8th Cir. 1985) (quoting Givan v. Mack Truck, Inc., 569 S.W.2d 243, 247 (Mo. App. 1978)).

Graham broke Hammer & Steel's Kelly bars on January 15, 2010, May 18, 2010, and July 10, 2010. Hammer & Steel immediately repaired and replaced the Kelly bars on January 18, 2010, and a replacement Kelly bar arrived on May 29, 2010 for the second Kelly bar break. Hammer & Steel removed the Sany drill rig after the third Kelly bar break in July. Consequently, Graham cannot claim that the exclusive remedy of repair and/or replacement fails of its essential purpose because the equipment was timely repair within a reasonable period. Assuming Graham has a claim for damages for the third Kelly bar break (which it does not) Graham's damages are limited to the amount paid for the Sany drill rig, which totals $75,000.00, plus tax and under the express terms of the Rental Agreement. Graham is not entitled to

_____

[12] Graham does not claim the terms of the Rental Agreement are unconscionable.

20

consequential damages or 'back charges' for job delays or other damages.  Hammer & Steel is entitled to summary judgment on Hammer & Steel's request that this Court declare that Graham's damages are limited to the rent paid for the Sany drill rig under as provided in the Rental Agreement.

## VI.    THE WRITTEN TERMS OF THE RENTAL AGREEMENT BARS GRAHAM'S MERITLESS WARRANTY CLAIMS.

Graham alleges Hammer & Steel provided various express and implied warranties regarding the equipment leased by Graham.  (Compl., ¶¶ 33-52).  The Rental Agreement expressly disclaims any such warranties.  The disclaimer of warranties in a contract document is effective to bar a claim based on express warranty.  See Karr-Bick Kitchens & Bath, Inc. v. Gemini Coatings, Inc., 932 S.W.2d 877, 879 (Mo. App. 1996); Clevenger and Wright Co. v. A.O. Smith Harvestore Products, Inc., 625 S.W.2d 906, 909 (Mo. App. 1981).   As to implied warranties, as discussed below, the language in the Rental Agreement complies with the requirements of MUCC § 400.2A-214(2) & (3) (that is, it was in writing, conspicuous, and mentions merchantability) and thus effectively disclaims all implied warranties.  See Karr-Bick, 932 S.W.2d at 879 (applying the UCC with regard to sales).  Because Graham's warranty claims are barred by the express terms of the Rental Agreement, Hammer & Steel is entitled to summary judgment for the dismissal of Counts II and III.

### A.    The Rental Agreement Does Not Expressly Warrant the Equipment Was Appropriate for the Project.

Graham alleges the "Rental Agreement" expressly warranted "that the equipment was appropriate for the Project."  (Compl., ¶¶ 19, 34).  Graham further alleges Hammer & Steel "expressly warranted to Graham that the drilling equipment, including the Sany Drill Rig, would

21

work for the purposes for which it was intended on the Project." (Id., ¶ 35). Graham contends Hammer & Steel cannot waive or disclaim the alleged express warranties. (Id., ¶ 39).

The Rental Agreement does not expressly warrant the drilling equipment "was appropriate for the Project." Paragraph 14 of the Rental Agreement expressly disclaims any such warranty by stating "[Graham] acknowledges that [Graham] has selected the equipment leased hereunder based entirely on [Graham's] judgment . . . ."[13] McDermand admitted he selected the Sany drill rig because it was cheaper than the Delmag (a bigger rig) and because the drill operator (Andrew Lerach) was familiar with that rig from the Mobridge, South Dakota project. (McDermand Depo. p. 227).[14]

**B.     The Rental Agreement Bars Claims for Breach of Implied Warranty.**

Graham alleges Hammer & Steel breached the implied warranties provided by Section 400.2A-212 of 400-2A-213 of the MUCC, and N.D.C.C. Chap. 41-02. (Compl., ¶ 42). Section 400.2A-212, entitled the "implied warranty of merchantability" of the MUCC provides:

> (1)     Except in a finance lease, a warranty that the goods will be merchantable is implied in a lease contract if the lessor is a merchant with respect to goods of that kind.
>
> (2)     Goods to be merchantable must be at least such as
>
> (a) pass without objection in the trade under the description in the lease agreement;
>
> (b) in the case of fungible goods, are of fair average quality within the description;

---

[13] The Rental Agreement did expressly warrant "that the equipment leased hereunder will be in good working order on the date of delivery to lessee and will conform to the manufacturers published specifications, instructions, and usage procedures." (Rental Agreement, ¶ 14). Graham has never alleged Hammer & Steel breached this express warranty. Furthermore, Graham accepted and used the equipment and never provided Hammer & Steel any written notice that the equipment was not in good working order and therefore accepted the equipment as provide in Paragraph 11 of the Rental Agreement which requires written notification within five days after delivery if the equipment is not in good condition.

[14] See Volz Aff., ¶ 8, Ex. 7.

(c) are fit for the ordinary purposes for which goods of that type are used;

(d) run, within the variation permitted by the lease agreement, of even kind, quality, and quantity within each unit and among all units involved;

(e) are adequately contained, packaged, and labeled as the lease agreement may require; and

(f) conform to any promises or affirmations of fact made on the container or label.

(3) Other implied warranties may arise from course of dealing or usage of trade.

Section 400.2A-213, entitled the "implied warranty of fitness for a particular purpose" of the MUCC goes on to provide:

Except in a finance lease, if the lessor at the time the lease contract is made has reason to know of any particular purpose for which the goods are required and that the lessee is relying on the lessor's skill or judgment to select or furnish suitable goods, there is in the lease contract an implied warranty that the goods will be fit for that purpose.

Section 400.2A-214 of the MUCC, however, allows parties to disclaim such implied warranties (entitled "exclusion or modification of warranties"), which provides in relevant part:

(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention "merchantability", be by a writing, and be conspicuous. Subject to subsection (3), to exclude or modify any implied warranty of fitness the exclusion must be by a writing and be conspicuous.  Language to exclude all implied warranties of fitness is sufficient if it is in writing, is conspicuous and states, for example, "There is no warranty that the goods will be fit for a particular purpose".

As provided by Section 400.2A-214 of the MUCC, Paragraph 14, of the Rental Agreement, entitled "**WARRANTIES"** expressly and conspicuously disclaims any such warranty by providing:

. . . . [Graham] understands and agrees that any <u>IMPLIED WARRANTIES OF MERCHANTBILITY OR FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY EXCLUDED</u>.

The Rental Agreement is clear.  The warranty disclaimer is underlined, capitalized, and mentions "merchantability".  Therefore, Graham as the Lessee is fully responsible for equipment selection.

Paragraph 19 entitled "**BINDING EFFECT/ENTIRE AGREEMENT"** of the Rental Agreement reinforces the provisions of Paragraph 14 by providing in part:

> There are no other oral or written promises, terms, conditions, representations of quality of fitness for any purpose, or warranties express or implied, concerning the equipment, other than those contained herein in writing, if any.

Graham's allegations it is entitled to an implied warranty of merchantability is contrary to the express terms of the executed Rental Agreement and Graham's own admission that it leased the Sany drill rig because it was cheaper and familiar to its operator.  Graham, not Hammer & Steel, is responsible for the choice of equipment and as such is responsible for all consequences resulting from that choice.

## VII.   GRAHAM'S FRAUD CLAIMS LACK MERIT AND SHOULD SUMMARILY BE DISMISSED AS A MATTER OF LAW.

In Counts IV and V of Graham's Complaint, Graham alleges Hammer & Steel committed fraudulent inducement (actual fraud) and constructive fraud in that it falsely represented that the drilling equipment including the Sany drill rig and the over-reaming tool "would accomplish the required drilling for the caisson."  The undisputed facts are to the contrary.   Therefore, Hammer & Steel is entitled to summary judgment dismissing Counts IV and V of Graham's Complaint.

### A.      Graham Provides No Evidence of Actual Fraud.

In Count IV Graham asserts Hammer & Steel committed fraudulent inducement and actual fraud when Maxa assured and represented to McDermand that the drilling equipment "was the appropriate drilling equipment that could timely complete the construction of the caisson for the Project work[.]" (Compl., ¶ 57.) Graham also alleges that Hammer & Steel knew or reasonably should have known these assertions were false, but nevertheless intended that

Graham would rely on the representations and lease the drilling equipment, which it did. (Id., ¶ 54(c), (e), (f)).

In order to prevail on its claim for fraudulent inducement, Graham must prove the following elements: "(1) that [Hammer & Steel] made certain material representations to [Graham]; (2) such representations were false when made; (3) that [Hammer & Steel] knew the representations were false; (4) that the representations were made with the purpose of deceiving [Graham]; (5) that [Graham] was, in fact, deceived; (6) [Graham] reasonably relied on the representations in signing the [rental and/or purchase agreements]; and (7) [Graham] suffered damage as a proximate result of the fraudulent misrepresentations." Bracht v. Grushewsky, 448 F.Supp.2d 1103, 1110 (E.D. Mo. 2006) (citing Trotter's Corp. v. Ringleader Restaurants, Inc., 929 S.W.2d 935, 939 (1996)).   See also U.S. for Use of Bussen Quarries, Inc. v. Thomas, 938 F.2d 831, 833 (8th Cir. 1991) (holding that element three of a claim for fraudulent inducement requires proof of the defendant's knowledge of the representation's falsity, or ignorance of its truth).

Graham further must demonstrate that Hammer & Steel did not intend to perform consistent with the alleged statements, at the time the statements were made.  Cole v. Homier Distributing Co., Inc., 599 F.3d 856, 862 (8th Cir. 2010).  "[A]bsent such an inconsistent intent there is no misrepresentation of fact or state of mind but only a breach of promise or failure to perform."  Craft v. Metromedia, Inc., 766 F.2d 1205, 1219 (8th Cir. 1985) (citations omitted), cert. denied, 475 U.S. 1058 (1986).

Graham contends Maxa made false assertions to McDermand that the drilling equipment was the appropriate equipment to perform the Project work.  (Compl., ¶ 59).  McDermand's testimony, however, confirms that no fraud occurred because Graham cannot establish that Maxa

25

in anyway intended to deceive Graham or to not perform.  Accordingly, Graham cannot establish

the essential elements of a fraud claim including to withstand summary judgment.  McDermand

testified:

> Q.    Is there anything that Todd Maxa told you that you believe to this day to be false?
> **A.    The assurance that the drill rig would be able to complete the project.**
> Q.    Is there anything else?
> **A.    That the drilling system would be able to complete the project.**

(McDermand Depo., p. 232).[15]

McDermand further testified:

> Q.    Basically, though, you're saying that Todd Maxa lied, is that right?
> **A.    I am not saying he lied.**
> Q.    Do you think Todd Maxa lied to you?
> **A.    I don't know.**
> Q.    Do you have any reason to believe that Mr. Maxa was trying to mislead you in any way with regard to the Parshall project?
> **A.    I – I don't have any reason to believe so.**
> Q.    Is there anybody else at Hammer & Steel besides Mr. Maxa that provided you with allegedly false information with regard to Hammer & Steel's drilling equipment for the Parshall project?
> **A.    I am not aware of anyone.**
> Q.    Did anybody else from Hammer & Steel besides Mr. Maxa provide Graham with any assurances that this drill rig would complete the Parshall project?
> **A.    I don't know.**
> Q.    To you, I'm saying any assurances to you, then, anybody else besides Mr. Maxa?
> **A.    No.**[16]

(Id., pp. 235-236).[17]

Graham admits McDermand was the primary person from Graham discussing the terms

of the equipment leasing with Hammer & Steel.  (Compl., ¶ 55).  McDermand testified that the

---

[15] See Volz Aff., ¶ 8, Ex. 7.

[16] Jones testified that Maxa is an honest man.  When asked "[d]o you think Todd Maxa is an honest man?"  Jones responded "[f]rom what I know of him, I would say that he is."  (Jones Depo., p. 202).

[17] See Volz Aff., ¶ 8, Ex. 7.

only alleged assurances he received were from Maxa.  McDermand's testimony regarding Maxa does not rise to the level of fraudulent conduct because Graham does not believe Maxa mislead Graham in anyway regarding the Project.  Graham has no evidence demonstrating that Hammer & Steel made false material representations to Graham that Hammer & Steel knew these representations were false, and that the representations were made with the purpose of deceiving Graham.  Because Graham cannot establish these essential elements of fraud by its own admissions, Hammer & Steel is entitled to summary judgment dismissing Count IV.

    **B.**       **<u>Graham's Constructive Fraud Claim Fails as a Matter of Law Because No Special Relationship Exists Between the Parties.</u>**

Graham alleges constructive fraud in Count V of its Complaint.  Graham asserts H&S committed "constructive fraud/fraudulent inducement." (Compl., ¶ 68).  Graham's allegations in Count V are identical to those in Count IV, except that rather than allege Hammer & Steel "knew or reasonably should have known" the assertions and representations were allegedly incorrect, Graham asserts Maxa and Hammer & Steel "were ignorant of the truth of these assertions and representations." (<u>Id.</u>, ¶ 68(c).)

On March 2, 2012 (Doc. #69) the Court dismissed Graham's constructive fraud claim because Graham failed to establish the existence of a confidential or fiduciary relationship between the parties.  The Court, however, allowed Graham to amend its complaint to include a claim or remedy of rescission citing <u>Evergreen National Corp. v. Carr</u>, 129 S.W.2d 492 (Mo. App. 2004).  (<u>See</u> Doc. # 69, <u>Id.</u>, p. 8, n.4).  Rather than bring a claim for rescission, Graham amended its complaint by electing rescission as another remedy for constructive fraud. Graham's additional remedy of rescission for constructive fraud does not revive this claim because Graham still has not established the existence of a confidential or fiduciary relationship. Accordingly, Graham has not established a *prima facie* case for constructive fraud and as a

matter of law Hammer & Steel is entitled to summary judgment for the dismissal of Graham's constructive fraud claim.

**VIII.  GRAHAM IS NOT ENTITLED TO REFORMATION BECAUSE THERE IS NO EVIDENCE OF FRAUD OR MUTUAL MISTAKE.**

Graham seeks reformation of the Rental Agreement in Count VII of its Complaint. Specifically, Graham seeks to amend the Rental Agreement to "expressly guarantee that the Sany Drill Rig and Over Reaming Tool were the correct equipment for the Project and that [Hammer & Steel] will compensate Graham for any damages relating to the failure of this equipment to perform the Project work[.]"  (Compl., ¶ 82).[18]  Graham disingenuously alleges this so-called express guarantee is the "expression of the parties' real intention."  (Id.).  Graham's self-serving hopes to reform the Rental Agreement into an unconscionable contract shifting all of the risk of the caisson construction to Hammer & Steel when Hammer & Steel has no ability to control the operation and use of its equipment is outrageous.

"Reformation is a remedy where a party to a contract may obtain modification of the terms of the contract such that those terms reflect the parties' original intent in forming the contract."  Chem Gro of Houghton, Inc. v. Lewis County Rural Electric Coop. Assoc., __ F.Supp. __, No. 2:11-cv-93-JCH (E.D. Mo. March 26, 2012) (citing Lunceford v. Houghtlin, 170 S.W.3d 453, 464 (Mo. Ct. App. 2005) and RESTATEMENT (SECOND) OF CONTRACTS § 155 (1981)).  Reformation is only available upon a showing that, due to either fraud or mutual mistake, the writing fails to accurately set forth the terms of the actual agreement or fails to incorporate the true prior intentions of the parties.  Elton v. Davis, 123 S.W.3d 205, 212 (Mo. Ct. App. 2003).

---

[18] The Rental Agreement does not address the over-reaming tool as that tool was purchased by Graham under a separate agreement.  This tool was used to successfully complete the caisson construction.  Graham does not seek to reform the purchase agreement for the over-reaming tool and therefore cannot be subject to reformation of the Rental Agreement which does not include the over-reaming tool.

Reformation of a written agreement is "an extraordinary equitable remedy that should be granted with great caution and only in clear cases of fraud or mistake." Secura Ins. Co. v. J. R. Saunders, 227 F.3d 1077, 1079 (8th Cir. 2000) (applying Missouri law).  The burden of proof in a reformation case is upon the party seeking to reform an instrument.  Ethridge v. Perryman, 363 S.W.2d 696, 698 (Mo. banc 1963).  To satisfy the burden (absent fraud), a party seeking reformation must establish by clear and convincing evidence: (1) a preexisting agreement between the parties; (2) the existence of a mistake and; (3) the mutuality of mistake.  Id. (emphasis added).  "Mutual" means the mistake must be shared by both parties and not be unilateral.  See, e.g., C. S. Foreman Co. v. Great Lakes Pipe Line Co., 274 F.2d 61, 65 (8th Cir. 1960).   Both contracting parties "must agree to what the instrument shall contain, and both must act in executing it upon the belief that it is so written."  Id. (quoting Parker v. Vanhoozer, 142 Mo. 621, 629, 44 S.W. 728).

Because there is unquestionably no evidence Hammer & Steel committed fraud as discussed above, reformation is only available for a mutual mistake.  Graham does not allege any particular error or mistake.  Rather, Graham alleges the Rental Agreement "did not express or conform to *Graham's* real intention[]" and does not "reflect *Graham's* intention or understanding."  (Compl., ¶ 81) (emphasis added).   Graham ignores that the alleged error or mistake must be *mutual*, not unilateral.  There is not a scintilla of evidence that Hammer & Steel intended to expressly guaranty that the drilling equipment leased to Graham was the "correct" equipment for the Project and that Hammer & Steel intended on assuming all risks associated with the equipment, including the costs to construct the caisson shaft. Consequently, because there is no evidence of fraud and Graham cannot make any showing that Hammer & Steel

intended to expressly guaranty its equipment, Hammer & Steel is entitled to the dismissal of Count VII as a matter of law.

## IX.   HAMMER & STEEL IS ENTITLED TO JUDGMENT IN ITS FAVOR FOR THE VALUE OF THE 60-INCH AUGER.

Hammer & Steel seeks return of the 60-inch auger or the value of the auger.  (Count IV of Amended Counterclaim, ¶¶ 27-30, Doc. #73).  Graham is responsible for "all risk of loss or damage[]" for the equipment rented under the Rental Agreement.  (Rental Agreement, ¶ 9).  The Rental Agreement provides that Graham "carry insurance to cover the full value of the equipment for all risk of loss or damage."  (Id.)  Graham provided Hammer & Steel with an additional insured certificate pursuant to the terms of the Rental Agreement.  Graham has not returned the Hartfuss 60-inch auger (valued at $52,387.00) and has indicated it will not attempt to recover this auger.  The Rental Agreement requires Graham to "immediately pay Lessor for such loss or damage."  Therefore, as a matter of law, Hammer & Steel is entitled to judgment in its favor against Graham for $52,387.00, the value of the 60-inch Hartfuss auger.

## CONCLUSION

WHEREFORE, for the reasons discussed above and for the reasons set forth in Hammer & Steel's Motion for Partial Summary Judgment and Statement of Material Uncontroverted Facts, attached hereto and incorporated by reference, Defendant Hammer & Steel, Inc. moves for partial summary judgment under Rule 56(b) of the Federal Rules of Civil Procedure and respectfully requests that this Court sustain its motion, enter judgment in its favor, and grant any further relief this Court deems necessary and just.

Respectfully submitted,

DATED:   July 23, 2012                    VOLZ LAW FIRM, LTD.

                                  By:    */s/   Jane L. Volz*
                                         Jane L. Volz, MN 0264891
                                         9846 Towering Oaks Curve
                                         Prior Lake, MN  55372
                                         Phone:  (952) 892-5000
                                         Fax: (952) 892-5110
                                         Email:  volzlawfirm@gmail.com

                                         David M. Duree, MBE 21003
                                         David M. Duree & Associates, P.C.
                                         312 South Lincoln Avenue
                                         P.O. Box 1416
                                         O'Fallon, IL 62269
                                         Phone: (314) 621-5751
                                         Fax: (314) 621-0322
                                         Email: law@dmduree.net
                                         ATTORNEYS FOR HAMMER &
                                         STEEL, INC.

## CERTIFICATE OF SERVICE

I hereby certify that on July 23, 2012, the foregoing was filed electronically with the

Clerk of Court through ECF, and that ECF will send an e-notice of the electronic filing to all

attorneys of record as follows:

**Matthew Collins, Esq.**
FABYANSKE WESTRA HART & THOMSON, PA
800 LaSalle Ave
Suite 1900
Minneapolis, MN 55402
612-359-7600
Fax: 612-359-7602
mcollins@fwhtlaw.com

31

**Kristine K. Kroenke, Esq.**
FABYANSKE WESTRA HART & THOMSON, PA
800 LaSalle Ave
Suite 1900
Minneapolis, MN 55402
612-359-7600
Fax: 612-359-7602
kkroenke@fwhtlaw.com

**Hannah Stein, Esq.**
FABYANSKE WESTRA HART & THOMSON, PA
800 LaSalle Ave
Suite 1900
Minneapolis, MN 55402
612-359-7600
Fax: 612-359-7602
hstein@fwhtlaw.com

**Dean B. Thomson, Esq.**
FABYANSKE WESTRA HART & THOMSON, PA
800 LaSalle Ave
Suite 1900
Minneapolis, MN 55402
612-359-7600
Fax: 612-359-7602
dthomson@fwhtlaw.com

**James F. Bennett**
DOWD BENNETT, LLP
7733 Forsyth Boulevard
Suite 1410
Clayton, MO 63105
314-889-7302
Fax: 314-863-2111
jbennett@dowdbennett.com

**John D. Comerford**
DOWD BENNETT, LLP
7733 Forsyth Boulevard
Clayton, MO 63105
314-889-7311
Fax: 314-863-2111
jcomerford@dowdbennett.com

DATED:   July 23, 2012                              VOLZ LAW FIRM, LTD.

                                        By:     /s/   Jane L. Volz
                                                Jane L. Volz, MN 0264891
                                                9846 Towering Oaks Curve
                                                Prior Lake, MN  55372
                                                Phone:  (952) 892-5000
                                                Fax: (952) 892-5110
                                                Email:  volzlawfirm@gmail.com